**BEDFORD COUNTY MEMORIAL HOSPITAL, et al., Plaintiffs,**

**v.**

**Margaret M. HECKLER, Secretary of Health and Human Services, Defendant.**

**Civ. A. No. 83–0386–R.**

United States District Court, W.D. Virginia.

March 28, 1984.

Daniel S. Brown, Roanoke, Va., Leonard C. Homer, Baltimore, Md., for plaintiffs.

Karen Breeding Peters, Asst. U.S. Atty., Roanoke, Va., Elise D. Smith, Dept. of Health & Human Serivces, Washington, D.C., for defendant.

## MEMORANDUM OPINION

TURK, Chief Judge.

This case is before the court on cross-motions for summary judgment. Plaintiffs are hospitals and other health care facilities licensed by the Commonwealth of Virginia and certified by the Social Security Act as "providers" of health care services.

As certified "providers" they qualify for reimbursement for the "reasonable cost"[1] of services provided to Medicare beneficiaries. 42 U.S.C. § 1395x(u). Plaintiffs are challenging the procedural and substantive validity of a regulatory amendment promulgated by the Department of Health and Human Services (HHS).[2] They seek declaratory and injunctive relief and sums due under 42 U.S.C. § 1395 et seq., the Medicare statute; 5 U.S.C. § 553 of the Administrative Procedure Act; and, 28 U.S.C. § 2201, the Declaratory Judgment Act.

On March 15, 1979 the Secretary of HHS announced an anticipated change in Medicare reimbursement policy through a notice of proposed rulemaking. 44 *Fed.Reg.* 15744. The final regulation, published on June 1, 1979, effective on June 30, 1979, dramatically changed the method of calculating reimbursement[3] for malpractice insurance costs (or self-insurance fund contributions) incurred by qualified providers servicing Medicare patients. Prior to adoption of this regulation, providers pooled medical malpractice insurance costs with other indirect administrative and general (A & G) costs. Reimbursement from Medicare funds for A & G costs was based on the percentage of services utilized by Medicare patients (a medicare utilization rate). That is, if Medicare patients utilized 50% of a provider's services, Medicare would reimburse that provider for 50% of its A & G costs, including 50% of its medical malpractice insurance premiums. The Medicare utilization rates for plaintiffs in this case range from approximately 27% to 60% for the cost years at issue here.

The challenged regulation takes medical malpractice insurance premiums out of the A & G category and directly apportions them between Medicare and non-Medicare patients as follows:

For cost reporting periods beginning on or after July 1, 1979, costs of malpractice insurance premiums and self-insurance fund contributions must be separately accumulated and directly apportioned to Medicare. The apportionment must be based on the dollar ratio of the provider's Medicare paid malpractice losses to its total paid malpractice losses for the current cost reporting period and the preceding 4-year period. If a provider has no malpractice loss experience for the 5-year period, the costs of malpractice insurance premiums or self-insurance fund contributions must be apportioned to Medicare based on the national ratio of malpractice awards paid to Medicare beneficiaries to malpractice awards paid to all patients. The Health Care financing Administration will calculate this ratio periodically based on the most recent departmental closed claim study. If a provider pays allowable uninsured malpractice losses incurred by Medicare beneficiaries, either through allowable deductible or coinsurance provisions, or as a result of an award in excess of reasonable coverage limits, or as a governmental provider, such losses and re-

---

1. To participate in the Medicare program, a hospital must file a "provider agreement" with the Secretary of HHS pursuant to 42 U.S.C. § 1395cc, under which it agrees not to charge Medicare patients for covered services, in return for reimbursement by Medicare for the "reasonable cost" of such services. 42 U.S.C. § 1395f(b)(1)(A).

2. The Department of Health, Education and Welfare (HEW) was replaced by the Department of Health and Human Services on May 4, 1980, pursuant to section 509(a) of the Department of Education Organization Act, Pub.L. 96–88, 93 Stat. 668, 42 F.R. 29642.

3. Payment to qualified providers under Medicare is made either directly or through fiscal intermediaries pursuant to contract with the Secretary. 42 U.S.C. § 1395h. At the close of its fiscal year, a provider submits a "cost report" which apportions costs between Medicare and non-Medicare patients. 42 C.F.R. § 405.406(b) and § 405.453(f). The intermediary conducts an audit and issues a determination of program reimbursement. An appeal from this determination may be taken to the Provider Reimbursement Review Board (PRRB or Board). 42 U.S.C. § 1395oo. The Board is bound by the Secretary's reimbursement regulations in determining such appeals. 42 U.S.C. § 405.1867.

lated direct costs must be directly assigned to Medicare for reimbursement.[4] For the years ending in 1980 and 1981 plaintiffs were reimbursed according to the regulation's direct apportionment method rather than on the basis of Medicare utilization. Those plaintiffs with no paid malpractice losses were reimbursed 5.1% according to the regulation's "national ratio."

■ Plaintiffs sought to challenge this reimbursement method before the Provider Reimbursement Review Board, but were notified that the Board lacked authority to determine the validity of the regulation. They then instituted this suit in federal district court pursuant to 42 U.S.C. § 1395 oo(f)(1). Before reaching the merits of the case, the court must address the threshold question of subject matter jurisdiction. Section 1395oo(f)(1) states in pertinent part:

> Providers shall have the right to obtain judicial review of any final decision of the Board, or of any reversal, affirmance, or modification by the Secretary, by a civil action commenced within 60 days of the date on which notice of any final decision by the Board or of any reversal, affirmance, or modification by the Secretary is received. Providers shall also have the right to obtain judicial review of any action of the fiscal intermediary which involves a question of law or regulations relevant to the matters in controversy whenever the Board determines (on its motion or at the request of a provider of services as described in the following sentence) that it is without authority to decide the question, by a civil

action commenced within 60 days of the date on which such determination is rendered.

Plaintiffs filed this suit sixty-four days from the date the PRRB determined it lacked jurisdiction to decide the validity of the regulation. Defendant's claim that the case was not, therefore, timely filed is premised on the latter part of § 1395oo(f)(1) which requires filing within sixty days from the date on which the PRRB renders its determination. Defendants argue that § 1395oo(f)(1) sets forth a jurisdictional prerequisite which must be strictly adhered to before a provider can obtain judicial review. Since plaintiffs did not meet the sixty day time limit, the defendants maintain the court lacks subject matter jurisdiction. The court does not agree.

This case arises under the Medicare provisions of the Social Security Act, set forth under Title XVIII of the Act, 42 U.S.C. § 1395 et seq. The question of jurisdiction over claims arising under the Social Security Act is most frequently litigated in the context of benefits in the Old Age, Survivors, and Disability Insurance Program, Title II of the Act, 42 U.S.C. § 401 et seq. It is well established, and the parties do not deny, that the jurisdictional analysis for provider claims in the Medicare Program is controlled by the principals and precedents developed in the context of Title II litigation. This is so because the key jurisdictional provisions in Title II, 42 U.S.C. § 405, have been incorporated by reference into the Medicare Statute (Title XVIII).[5]

---

4. 42 C.F.R. § 405.452(b)(1)(ii). For example, three similarly situated hospitals with malpractice insurance premiums of $100,000 and a Medicare patient utilization rate of 40% would receive reimbursement, as follows:

> Hospital A with one claim paid to a Medicare patient will receive 100% reimbursement or $100,000; Hospital B with one claim paid to a non-Medicare patient will receive 0% or no reimbursement; Hospital C with no malpractice claims paid out will receive 5.1% or $5,100 reimbursement.

Under the Medicare utilization method of reimbursement each hospital would receive $40,000 from Medicare toward their medical malpractice premium.

5. 42 U.S.C. § 1395ii provides: The provisions of sections 406, 408, and 416(j) of this title, and of subsections (a), (d), (e), (f), (h), (i), (j), (k), and (l) of section 405 of this title, shall also apply with respect to this subchapter (The Medicare Act) to the same extent as they are applicable with respect to subchapter II of this chapter. Section 405(h) provides as follows:

> The findings and decisions of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal or governmental agency except as herein provided. No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 41 [1331 et

Moreover, the programs established under Title II and Title XVIII have parallel appeal mechanisms: Under Title XVIII, 42 U.S.C. § 1395oo(f)(1) provides the means for judicial review. Under 42 U.S.C. § 405(g), the requirements for judicial review for matters arising under Title II are set forth as follows:

(1) a final decision of the Secretary made after a hearing;

(2) commencement of a civil action within 60 days after the mailing of notice of such decision (or within such time as the Secretary may allow);

(3) filing of the action in an appropriate district court

The Court of Appeals for the Eleventh Circuit recently held the Medicare judicial review provision, 42 U.S.C. § 1395oo(f)(1), to be the "functional equivalent" of the Title II jurisdictional provision 42 U.S.C. § 405(g). *VNA of Greater Tift County, Inc., v. Heckler*, 711 F.2d 1020, 1025, n. 7 (1983). As a result, analysis under Title XVIII should track case law construing the parallel provision of Title II.

The leading cases in this area are *Matthews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18, (1976) and *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975). In *Weinberger*, the Court, in considering whether the plaintiffs had satisfied the prerequisites of § 405(g), specifically held: "the second and third ... requirements of [that section, *i.e.*, the sixty-day time limit and the designation of the appropriate place of filing] specify respectively, a statute of limitations, and appropriate venue. As such, they are waivable by the parties .... We interpret the first requirement, however, to be central to the requisite grant of subject matter jurisdiction."

Accordingly, the court finds this compelling authority for viewing the 60 day time limit of § 1395oo(f)(1) as a statute of limita-

tions as well. It is clear that a statute of limitations is an affirmative defense which must be raised in a responsive pleading, and if not, it is deemed waived. 8(c) Fed.R. Civ.P.

The instant case was filed on April 22, 1983. Responsive pleadings and oral argument have been received relative to the merits of the case. Indeed, the court has considered the case to be ready for decision and had proceeded to a preliminary draft several weeks prior to the receipt of defendant's motion to dismiss, which was filed on March 7, 1984. In light of this sequence and considering the analysis set forth above, the court must conclude that even if the plaintiff did not meet the 60 day filing requirement of U.S.C. § 1395oo(f)(1), the statute merely creates an affirmative defense which has been effectively waived by the defendant. Accordingly, inasmuch as the court must conclude that subject matter jurisdiction is properly vested, the court proceeds to consideration of the merits.

The substance of plaintiffs's complaint involves three challenges to the regulation. First, they maintain that the regulation is procedurally defective because it was promulgated in violation of the rulemaking requirements of the Administrative Procedure Act (APA), 5 U.S.C. § 553. Second, they argue that the Secretary's action in promulgating the regulation has no rational basis and is, therefore, arbitrary and capricious and an abuse of discretion under the APA, 5 U.S.C. § 706(2)(A). Finally, they claim the regulation violates the Medicare statute, 42 U.S.C. § 1395x(v)(1)(A) because, among other things, it fails to reimburse providers for "reasonable costs" [6] of necessary services as required; it shifts the burden of "Medicare-related" actual costs to non-Medicare patients; and, it undermines the financial stability of provid-

seq.] of Title 28 to recover on any claim arising under this subchapter.

**6.** "Reasonable cost" is defined in the statute as the "cost actually incurred excluding therefrom any part of the incurred cost found to be unnec-

essary in the efficient delivery of needed health services." 42 U.S.C. § 1395x(v)(1)(A). Congress directed the Secretary of HHS to further define "reasonable cost" by issuing reimbursement regulations.

ers, whose Medicare reimbursement rate fluctuates depending on paid claims.

To date, these same claims have been addressed by eleven different United States District Courts. Seven courts have held the regulation invalid. *See Mt. Carmel Mercy Hospital v. Heckler,* 581 F.Supp. 1311 (E.D.Mich.1983); *St. James Hospital v. Heckler,* 579 F.Supp. 757 (N.D. Ill.1983); *Abington Memorial Hospital v. Heckler,* 576 F.Supp. 1081 (E.D.Pa.1983); *Chelsea Community Hospital v. Heckler,* (No. 83CV-6126 Dec. 20, 1983, E.D.Mich.) (Judge Joiner adopted the opinion in *Mt. Carmel, supra.) Humana of Illinois, Inc. v. Heckler,* 584 F.Supp. 618 (C.D.Ill.1984); *Albany General Hospital v. Heckler,* 584 F.Supp. 614 (D.Or.1984); *St. Joseph's Hospital, Tuscon v. Heckler,* (No. 82–781 March 2, 1984, D.Ariz.). Four courts have upheld the regulation. *See Athens Community Hospital v. Heckler,* 565 F.Supp. 695 (E.D.Tenn.1983); *Cumberland Medical Center v. Heckler,* 578 F.Supp. 39 (M.D. Tenn.1983), *appeal docketed,* No. 83–5549 (6th Cir. August 9, 1983)). (Judge Morton adopted the opinion in *Athens, supra.*); *Humana of Aurora, Inc., d/b/a/ Aurora Community Hospital v. Heckler,* (No. 83–Z–70, September 19, 1983, D.Colo.) (Judge Weinshienk issued her opinion from the bench.); *Boswell Memorial Hospital v. Heckler,* 573 F.Supp. 884 (D.D.C.1983). Inasmuch as judicial authority on this matter is split, this court finds it necessary to state its reasons for invalidating the regulation.

## PROCEDURAL ISSUES

■ Plaintiffs contend that the Secretary failed to comply with the notice and comment provisions of section 553 of the APA. The Agency, they argue, provided an inadequate basis and purpose statement and issued an insufficient notice of proposed rulemaking (NPRM) with regard to the data used by the Agency to support the proposed rule. They complain that the NPRM only generally identified the data and the study upon which the agency was relying as "[a] study conducted by a HEW consultant." *See* 44 *Fed.Reg.* 15745. They also complain that the Agency's NPRM improperly omitted the warnings which had been given by the study's author against any generalized use of the data. This, coupled with an initially short public comment period,[7] reflected the Secretary's effort to "discourage meaningful comment ... on the study," according to plaintiffs. The court finds no merit in plaintiffs's attack on the NPRM. It does, however, agree with their claim of an inadequate basis and purpose statement.

Section 553 of the APA requires, among other things, published notice of proposed rulemaking, an opportunity for interested persons to comment and a "concise general statement of [the] basis and purpose" of the rules ultimately adopted. 5 U.S.C. § 553(b) & (c). These procedural requirements are intended to assist judicial review as well as to provide fair treatment for persons affected by an administrative rule. Consequently, there must be an exchange of views, information and criticism between interested persons and the agency. *Home Box Office, Inc., v. F.C.C.,* 567 F.2d 9, 35 (D.C.Cir.1977) *cert. denied,* 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977), citing *Portland Cement Ass'n v. Ruckelshaus,* 486 F.2d 375, 393–94 (1973), *cert. denied,* 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974). Contrary to plaintiffs's position, however, section 553(b) does not require that interested parties be provided precise notice of each aspect of the regulations eventually adopted. Rather, notice is sufficient if it affords interested parties a reasonable opportunity to participate in the rulemaking process. *Forester v. Consumer Product Safety Commission,* 559 F.2d 774, 787 (D.C.Cir.1977). It has been held

---

**7.** Plaintiffs point to the 45 day public comment period initially offered by the Secretary (44 *Fed. Reg.* 15745) contrary to Executive Order 12044, which required a 60 day public comment period

(44 *Fed.Reg.* 12661, March 23, 1978). This shortened time period was, however, extended on May 1, 1979 to the required 60 days by the Secretary. 44 *Fed.Reg.* 25476.

sufficient, therefore, if the notice required by the APA, *or the information subsequently supplied to the public* discloses in detail the thinking that has animated the formation of a proposed rule and the data upon which the rule was based. *Home Box Office, supra,* at 35 (emphasis supplied).

As to the instant case, the court is of the opinion that the notice provided by the agency was sufficient to apprise interested persons of the substance of the proposed regulation and of the study upon which the agency relied to support it. The NPRM not only mentioned the existence of the Westat Study, but also provided a name, address and telephone number of an agency official who could be contacted for additional information. 44 *Fed.Reg.* 15744. Leading hospital organizations received copies of the study and did in fact challenge its statistical validity before the agency. Plaintiffs here, as in *Abington,* therefore, "have little cause to complain they lacked effective notice." *Abington, supra,* 576 F.Supp. at 1085.

Furthermore, district courts which have reviewed the NPRM have found agency compliance with the notice and comment provisions of the APA. In *Boswell Memorial Hospital v. Heckler,* 573 F.Supp. 884 (D.D.C.1983) the court expressly affirmed the sufficiency of the information provided by the agency holding:

> The plaintiffs argue that when a rule is based on "scientific data" the agency must identify the data, describe the sci-

entific methodology used and provide sufficient information to elicit informed comments. *Detailed information on methodology is not necessary, if the basis for the rulemaking can be found in other, relevant sources.* The Secretary's primary scientific resource was the Westat Report—a study of malpractice claims closed by nine insurance companies during a four-month period in 1976. The Westat Report was not widely distributed throughout the health care community, however, major health care organizations received copies, including the American Hospital Association, the Hospital Corporation of America and the Federation of American Hospitals. These organizations offered comments criticizing the statistical validity of the Westat Report.

\*   \*   \*   \*   \*   \*

It appears from the record submitted in this case, that the information supplied by the Secretary met the requirements of the APA. (Emphasis supplied, citations omitted).

*See also Athens Community Hospital v. Heckler,* 565 F.Supp. 695, 698 (E.D.Tenn. 1983). Even reviewing courts which struck down the regulation on other grounds found agency compliance with the notice and comment provisions of the APA. *See Mt. Carmel Mercy Hospital; Abington Memorial Hospital; Chelsea Community Hospital, supra.*[8] The court next con-

---

[8] Plaintiffs would have this court rely on *United States Lines v. F.M.C.,* 584 F.2d 519 (D.C.Cir. 1978); *Natural Resources Defense Council, Inc. v. United States Nuclear Regulatory Commission,* 547 F.2d 633 (D.C.Cir.1976); *Portland Cement Ass'n v. Ruckelshaus,* 486 F.2d 375 (D.C.Cir. 1973); and others, for the proposition that the regulation should fall because the basic data relied upon was not specified in the NPRM. These cases are inapposite. In *United States Lines* the agency's decision was reached at least in part on the basis of information unknown to the parties and to the court. There was not merely a failure to specifically identify the supporting data in the NPRM, the data was not included in the administrative record. 584 F.2d at 533. In *Natural Resources Defense Council,* the case was remanded to the agency on the grounds that the administrative record, *not the*

NPRM, was inadequate to sustain the rule. Critical evidentiary support underlying the proposed rule had not been subjected to cross-examination and discovery during the rulemaking hearing, pursuant to an improper agency directive. 547 F.2d at 654. In *Portland Cement Ass'n* the Environmental Protection Agency adopted a standard for emission control levels on December 16, 1971. The agency failed to make available the details of test results and procedures which formed a partial basis for the standard until April of 1972. Full disclosure of the methodology followed in those tests raised certain problems on which the petitioners had no timely opportunity to comment. 486 F.2d at 392. Other cases cited by plaintiffs are similarly distinguishable. See *United States v. Nova Scotia Food Products Corp.,* 568 F.2d 240 (2nd

siders plaintiffs's claims that an insufficient basis and purpose statement accompanied the regulation and that the Secretary failed to adequately respond to the many public comments against the regulation.

During the rulemaking process approximately six hundred comments on the proposed regulation were submitted by health care institutions, consumers, major accounting firms, insurance companies, risk managers, nurses, health care consultants, actuaries, physicians and Medicare beneficiaries. These comments included, among other things, attacks on the statistical validity of the Westat Report; challenges to the Secretary's assumption that an individual provider's paid claims history determines the amount of malpractice insurance premium costs actually incurred; and questions as to whether the rule accurately apportioned malpractice expenses. When the regulation was published in final form its general purpose, as articulated in the basis and purpose statement was to "reimburse medicare providers [for malpractice costs] on a basis more closely related to actual malpractice [loss] experience." 44 Fed.Reg. 31641. The Secretary concomitantly acknowledged that "[a]ll comments received were against the proposal and [that the comments] recommended that [HEW] withdraw [the regulation] entirely." Id. The supporting data base (the Westat Study) was fully identified; the legislative and policy considerations underlying the regulation were set forth; and rejection of certain alternatives was explained.[9] In addition, the basis and purpose statement disclosed what the agency considered to be the "most significant" comments and objections by the public. 44 Fed.Reg. 15744 (March 1979). The basis and purpose statement segregated the comments into four major categories and stated the Secretary's conclusions concerning those categories.[10] The Secretary maintains that these meas-

ures effected compliance with the APA. This court does not agree.

■ The APA requirements regarding consideration of public comments and publication of a basis and purpose statement are set forth in 5 U.S.C. § 553(c) as follows:

> After notice required by this section, the agency shall give interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose....

Courts interpreting this section have required the basis and purpose statement to be sufficiently detailed and informative to allow a searching judicial scrutiny of how and why the regulations were actually adopted. In particular, the statement must point to administrative determinations of a factual sort to allow a reviewing court to satisfy itself that none of the regulatory provisions were framed in an "arbitrary or capricious" manner. See National Welfare Rights Org. v. Mathews, 533 F.2d 637, 648 (D.C.Cir.1976), citing Amoco Oil Co. v. EPA, 501 F.2d 722, 739 (D.C.Cir.1974). In addition to adequately explaining the agency's decision-making process, the statement must enable

> a reviewing court [to] assure itself, not only that a diversity of informed opinion was heard, but that it was genuinely considered .... [W]here apparently significant information has been brought to [the agency's] attention, or substantial issues of policy or gaps in its reasoning raised, *the statement of basis and purpose must indicate why the agency decided the criticisms were invalid.* Boilerplate generalities brushing aside detailed criticism on the basis of agency

Cir.1977); *Asarco, Inc. v. EPA,* 616 F.2d 1153 (9th Cir.1980).

**9.** See Appendix A, *infra.*

**10.** The four categories were set up as follows: (1) Opposition to Direct Apportionment, (2) Direct Assignment of Overhead Costs, (3) Cash Flow, (4) Claims Management. See Appendix A, *infra,* for full text.

"judgment" or "expertise" avail nothing; what is required is reasoned response, in which the agency points to particulars in the record which, when coupled with its reservoir of expertise, support its resolution of the controversy. (emphasis supplied).

*Natural Resources Defense Council, Inc., v. United States Nuclear Regulatory Commission,* 547 F.2d 633 (D.C.Cir.1976), *rev'd on other grounds by Vermont Yankee Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). *See also Portland Cement, supra.* This is not to say that the Secretary must respond to every "nonfrivolous substantive inquiry" made by the public. *Community Nutrition Institute v. Bergland,* 493 F.Supp. 488, 492–93 (D.D.C.1980). The rulemaking record must, however, reflect the requisite consideration of the relevant matter presented. *Natural Resources, supra.* Without this, the opportunity to comment is meaningless. *See Home Box Office, Inc. v. FCC,* 567 F.2d 9, 35 (D.C.Cir.1977).

█ In this case there exists inadequate evidence in the basis and purpose statement that the agency genuinely considered the relevant issues raised by the comments submitted in response to the final rule. In reaching this conclusion this court finds

persuasive the reasoning in *Abington, supra,* where Judge Fullam found:

particularly disturbing ... the complete lack of response to comments that challenged the statistical validity of the Westat Report, the sole empirical study on which the Malpractice Rule was based.... The preamble to the final rule contains not a word acknowledging that any commenter criticized the Westat Report; far less did it make an adequate response to those criticisms.

Nor did the Secretary address other points raised by commenters save in a highly conclusory fashion.

576 F.Supp. at 1086. Interested hospital associations were not the only source of criticism of the regulation. In the Westat Study, the authors admonished against any generalized use of the data. Their comments included warnings that it was "virtually impossible to generalize beyond the sample" and that, "there was no assurance that the sample was in any way representative." [11] These criticisms, coupled with the hundreds of comments submitted by the public are relevant because they implicate serious statistical problems with the "scientific" basis for the Agency's decision to change its reimbursement policy. As such, they require a reasoned response.[12] Thus,

---

**11.** *See also St. James, supra,* at 765 where the court summarized the authors's many criticisms of the Westat Study as follows:

Because the data base consists of a census of claims closed by nine private insurance carriers during a four month period in 1976, it is not altogether clear what constitutes the universe of claims from which this "sample" was drawn. It seems proper, since this is a census, to make inferences only within the time frame for which the data were collected and only to the universe of claims closed by nine participating companies. Pl. Ex. 21 at 2–9 ... The sample was judgmental rather than a probability sample .... Pl. Ex. 21 at 2–1.

**12.** The Secretary argues that any attack on the Westat Study is inappropriate as it was used merely to bolster her previous finding that Medicare had been overpaying the costs of malpractice insurance; and, that since the regulation is reasonable it must be sustained even without the Westat Report. She attacks the decisions in *Mt. Carmel Mercy,* and *Abington, supra,* as erroneous for their failure to evaluate

the whole record and her findings which she says were not premised solely on Westat, but were rooted in the Department's full study of the malpractice problem. These arguments miss the point of section 553(c). Assuming, arguendo, that the plaintiffs's attacks on Westat are invalid and that the regulation does in fact find support in other sources, the Secretary is, nevertheless, obligated by the APA to show this in the preamble to the regulation (the statement of basis and purpose). *See Natural Resources, supra,* and *St. James, supra,* where the court held:

that the Secretary proceeded to promulgate a final rule even though the comments were unanimously in opposition, does not [in itself] prove that the Secretary failed to consider the comments. However, where apparently significant information has been brought to its attention [here, *e.g.,* the comments within the Westat Study itself, the post-study comments by Westat people, and objections to the study raised by several major health care groups] or substantial issues of policy or gaps in its rea-

the basis and purpose statement in 44 *Fed. Reg.* 31641 fails to reflect the required exchange of views, information, and response to criticism. *See Home Box Office, Inc. v. F.C.C.*, 567 F.2d 9, 35–36.

### SUBSTANTIVE ISSUES

Plaintiffs's substantive attack on the regulation involves two claims. First, they argue that the regulation has no rational basis, and therefore, the Secretary's action was "arbitrary and capricious" in violation of the APA. Second, they maintain that the regulation violates the Medicare Act. The court will deal with each of these claims separately.

### *Violation of the APA*

Plaintiffs claim the Secretary violates the arbitrary and capricious standard of the APA, 5 U.S.C. § 706(2)(A), by offering an explanation for the regulation based on inadequate evidence (the Westat Study) and by failing to consider all relevant data pertaining to the malpractice problem. Pls. brief at 37–38. The Secretary argues that the Westat Study merely confirms conclusions already deduced by the Agency from a full study of the malpractice problem conducted in 1973, but not made a part of the Administrative record. Moreover, the Secretary boldly asserts that the regulation must be sustained even without the Westat Study as a reasonable exercise of executive discretion. Defs. memo at 16. She attempts, therefore, to support her decision to change the method of malpractice insurance reimbursement with evidence not found in the record. This she cannot do.

▇ The applicable standard of review, § 706(2)(A) of the APA provides:

that the reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary and capricious, an abuse of dis-

cretion or otherwise not in accordance with law .... *Camp v. Pitts*, 411 U.S. 138 at 142 [93 S.Ct. 1241, at 1244, 36 L.Ed.2d 106] (1973).

This standard is a highly deferential one. It presumes agency action to be valid. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). This is not to say, however, that the court must rubber-stamp the agency decision as correct. To do so would render the review process superfluous. *Ethyl Corp. v. Environmental Protection Agency*, 541 F.2d 1, 34 (D.C.Cir.1976). Therefore, the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. *Citizens to Preserve Overton Park, supra.* Although the court is not permitted to substitute its judgment for that of the agency, it must make a substantial inquiry into the facts to insure that the agency demonstrates a rational connection between the facts found and the choice made. *Id., see also United States Lines, Inc., v. Federal Maritime Commission*, 584 F.2d 519 (D.C. Cir.1978). Furthermore, the validity of the agency's action must be sustainable on the administrative record made. *Camp v. Pitts, supra*, 411 U.S. at 143, 93 S.Ct. at 1244 and *Almay, Inc. v. Califano*, 569 F.2d 674, 681 (C.A.D.C.1977) (where the court held that since informal rulemaking procedures are much more susceptible to abuse, it becomes all the more important that a rational basis for the agency's decision be found in the facts of the record). With this limited scope of review in mind, the court has searched the rulemaking record and can find no rational basis for the regulation.

▇ The Westat Study [13] indicated that Medicare patients represented approxi-

---

soning raised, the statement of basis and purpose must indicate why the agency decided the criticisms were invalid. At 765.

**13.** The Westat Study was based on data obtained from nine private insurance carriers selected by the American Insurance Association, covering all claims closed during the period

from July 1 through October 1, 1976. (Defs. Ex.C at 2–1). Insureds from these nine companies were involved in 84% of all claims closed by private carriers in 1976.

mately 12% of the study's 2,637 malpractice claims where source of payment (Medicare, Medicaid or self-payment) was identified. In addition, the study indicated that of $35,-680,971 in identified malpractice awards, 5.1% or $1,820,303 represented awards to Medicare patients. Westat Report at 5–9. Further evidence "showed" that in years prior to 1978, Medicare beneficiaries utilized at least 30% of all inpatient hospital services. Record, Vol. 1, tab 7 at 3. From these figures, the Secretary determined that under the utilization method of apportioning costs, Medicare was reimbursing costs at more than six times its portion of total malpractice losses against which such insurance was purchased. This, the Secretary maintains, justified her action in formulating the rule, and "conclusively" established what she already knew from her previous study of the malpractice problem. The administrative record reveals, however, that the agency never mentioned any study other than the Westat Study in its NPRM, or in the basis and purpose statement. There is no copy or analysis of the "full study" referred to in the Secretary's memorandum in the rulemaking record. The agency never identified at any time prior to the issuance of the regulation any other source as playing a part in its thinking, consideration, or decision to issue the challenged regulation. Consequently, since the regulation must be sustained on the administrative record alone, a rational basis for the regulation must be found in the Westat Study. For the reasons cited in *St. James, supra,* the court believes that the Westat Study is sorely inadequate to pass this test.

In *St. James,* Judge Will focused on the warnings found in the Westat Study itself:

> the authors of the Westat Study cautioned against extrapolation of wide-

ranging conclusions and noted that "conclusions must be drawn very cautiously because of the possibility of biased data." The authors note two potential sources of bias in the sample of claims. First, many claims had multiple defendants who were not always represented by participating companies and although reporting companies probably knew the total number of defendants "they could not provide us with specific information about their characterizations." The second potential source of bias is that some providers, especially hospitals, are self-insuring and thus their claims had "no chance of turning up in the data base." (citations omitted).

at 766. Judge Will went on to cite *Almay, Inc. v. Califano, supra,* at 674, 677, 682 where:

> the court considered whether the FDA's reliance on a "flawed survey," about which the Director of the FTC's Bureau of Consumer Protection who sponsored and designed the study warned that the results should be used with caution, constituted a violation of the arbitrary and capricious standards of 5 U.S.C. § 706(2)(A). The court held that reliance on the survey was a "clear error of judgment." In the present case, reliance on the Westat Study is similarly an error of judgment. (citations omitted).

at 766. In addition to these criticisms it should be noted that the Westat Study was not designed to analyze the frequency or size of claims comparing Medicare and non-Medicare patients or to distinguish claims against hospitals from claims against other health care providers, even though claims against physicians, dentists, and nursing homes were included in the data base.[14] Standing alone, this fact

14. As stated in Westat, its general purposes were:

> to undertake an analysis of the frequency and types of claims and comparisons for economic losses. ... *[T]he objective is a detailed examination of the causes of injuries that lead to claims* as well as legal systems and patient characteristics that are related to the occurrence of claims.

The purpose of the analysis of causes of injuries is to provide information that can be used to develop injury prevention programs as a policy approach to reduce the occurrence of malpractice incidents. The purposes of analysis of size awards are (1) to determine the importance of economic losses in determining award amounts and (2) to examine selected characteristics such as changes in the legal

would be sufficient to invalidate the Secretary's reliance on Westat. When considered with the authors's stated limitations on the use of the study and their warnings of statistical bias in the sample it can only be concluded that the regulation lacks a rational basis and cannot be sustained.[15]

### Violation of the Medicare Statute

Since the court has determined that the regulation is arbitrary and capricious in violation of the APA it need not address plaintiffs's claim that it also violates the Medicare statute. The court is of the opinion, however, that Judge Will correctly evaluated this issue and reached a proper result in his opinion in St. James, supra.[16]

### CONCLUSION

The medical malpractice reimbursement regulation is both procedurally and substantively defective and must therefore, be remanded to the Agency for further action not inconsistent with this Opinion.

of the year or the cost of assets acquired during the year.

*   *   *   *   *

Signed at Washington, D.C. this 23rd day of May, 1979.

Jan. D. Lanoff,

*Administrator, Pension and Welfare Benefit Programs, Labor Management Services Administration.*

[FR Doc. 79–18801 Filed 3–31–78 8:45 am]

BILLING CODE 4610–29–11

---

DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE

Health Care Financing Administration

**42 CFR Part 405**

Principles of Reimbursement for Provider Costs and for Services by Hospital-Based Physicians; Direct Apportionment of Malpractice Costs to Medicare

AGENCY: Health Care Financing Administration (HCFA), HEW.

ACTION: Final rule.

SUMMARY: This amendment requires malpractice costs incurred by a provider to be directly apportioned to Medicare based on Medicare malpractice loss experience, instead of the current apportionment basis of Medicare's overall utilization of provider services. It requires a separate accumulation and direct apportionment of malpractice insurance premiums and self-insurance fund contributions. In addition, when a provider pays allowable uninsured malpractice losses incurred by Medicare beneficiaries, as a result of the application of deductible or coinsurance provisions of a purchased insurance policy, or as a result of an award in excess of reasonable coverage limits, or as a governmental provider, Medicare will reimburse the costs of these losses and any related direct costs. The purpose is to reimburse Medicare providers on a basis more closely related to actual malpractice experience.

DATE: Effective July 1, 1979.

FOR FURTHER INFORMATION CONTACT: Mr. Hugh McConville, (301) 594–9682

SUPPLEMENTARY INFORMATION:

system that affect the size of awards. Pls. Ex. 21 at 1–3 (emphasis supplied).

The study specifically stated that "it is not the explicit purpose of this study to make national yearly estimates." *Id.*

15. The Secretary cites the following language from *Ethyl Corp. v. EPA, supra,* at 37–38 for the proposition that she need not disregard the Westat data merely because of the possible uncertainties and margin of error in the report:

We need not see a single dispositive study that fully supports the Adminstration's determination. Science does not work that way; nor, for that matter does adjudicatory fact finding.

Taken out of context this language might support the Secretary's position. A full reading of the case, however, reveals a distinct difference from the instant case. The Administrator's decision in *Ethyl Corp.* was based on "the inconclusive but suggestive results of *numerous* studies." *Id.* (emphasis supplied). The *Ethyl* court explained that:

[b]y its nature, scientific evidence is cumulative: the *more* supporting, albeit inconclusive, evidence available, the more likely the accuracy of the conclusion. If one single study or bit of evidence were sufficient independently to mandate a conclusion, there would, of

course be no need for any other studies. Only, rarely, however, is such limited study significant. *Id.*

16. Judge Will held that "when, as here, the chosen method [of reimbursement] neither assures that Medicare costs will not be borne by non-Medicare patients nor that hospitals will be reimbursed the reasonable costs of their services ('actual costs minus those found to be unnecessary in the efficient delivery of health services') then the regulation does not carry out the mandate of the Medicare statute and is invalid." *St. James, supra, at 767.*

It should be noted that this court, like the *St. James* court did not consider affidavits filed by plaintiffs in support of their challenge to the Westat Study. This court agrees with the Secretary and Judge Will that these affidavits are not part of the rulemaking record, and therefore, cannot be considered by the reviewing court when determining the validity of the regulation. *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 419–420, 91 S.Ct. 814, 825–826, 28 L.Ed.2d 136 (1971); *see also St. James, supra, at 762.*

## Background

Under sections 1814(b) and 1833(a)(2)(A) of the Social Security Act, providers of services are to be paid the lesser of reasonable cost of services furnished to beneficiaries or the customary charges made by the provider for the same services. Section 1861(v)(1)(A) of the Act defines reasonable cost and authorizes the Secretary to issue regulations establishing the methods to be used and items to be included in determining reasonable costs. These regulations are set forth in 42 CFR Part 405, Subpart D.

Under current regulations and other instructions issued by Medicare, malpractice costs are accumulated in the administrative and general cost center and allocated to the revenue-producing and other cost centers on the statistical basis of accumulated costs. The costs in the revenue-producing cost centers, including appropriate allocated overhead costs, are then apportioned to Medicare using the ratio of Medicare charges to total charges, or another appropriate statistical basis for ancillary and outpatient services, and the average cost per diem for Medicare beneficiaries for general routine and special care unit services.

This method results in Medicare paying a disproportionate amount of malpractice costs. A national study conducted by a DHEW consultant indicates that malpractice awards for Medicare patients are significantly lower in amount than losses for other patient population. The lower awards for Medicare patients result because the income potential and life expectancy of these patients are less than the non-Medicare population. Thus, the use of overall Medicare utilization to allocate malpractice costs results in Medicare's paying a disproportionate amount of malpractice costs.

This amendment avoids these disproportionate payments by restructuring the cost finding and cost apportionment procedure. Costs of malpractice insurance premiums and self-insurance fund contributions will be accumulated in a specific malpractice cost center and directly apportioned to Medicare based on the provider's Medicare malpractice loss experience. The dollar ratio of malpractice losses paid for Medicare beneficiaries to total malpractice losses paid for all patients for the current cost reporting period and the preceding 4-year period will provide the basis for apportioning these malpractice costs to Medicare.

The use of an actuarial estimate when a provider has minimal malpractice losses during the 5-year period, as proposed in the Notice of Proposed Rulemaking, could also have resulted in Medicare sharing disproportionately in malpractice costs. Therefore, the final regulation has been revised to require a provider to use the national ratio of the dollar value of Medicare malpractice awards to total malpractice awards as determined by the 1976 Departmental

closed claim study performed by Westat, Inc. This national ratio, as determined by the latest study, is 5.1 to 100 or 5.1 percent and is to be used instead of an actuarial estimate for apportioning malpractice insurance premiums or self-insurance fund contributions. When a provider has no malpractice loss experience for the 5-year period specified in the final regulation, Medicaid reimbursement of malpractice insurance premiums or self-insurance fund contributions would be determined by applying the national ratio of 7.5 to 100 (or 7.5 percent). This ratio was also determined by the most recent Departmental study of closed claims.

If a provider pays allowable uninsured malpractice losses for Medicare beneficiaries, as a result of the application of deductible or coinsurance provisions of a purchased insurance policy or a funded self-insurance program, or as a result of an award in excess of reasonable coverage limits, or as a governmental provider, those losses and related direct costs will be directly assigned to Medicare for reimbursement.

This regulation impacts Medicaid reimbursement because under 42 CFR 447.261(b)(2), for payment of inpatient hospital services, States participating in Medicaid must either adopt Medicare standards and principles for determining reasonable cost reimbursement as set forth in 42 CFR 405.402 through 405.455 or must meet the criteria in 42 CFR 447.261(d).

### Discussion of Major Comments

A Notice of Proposed Rulemaking for this regulation was published on March 15, 1979, in the Federal Register (44 FR 15641). Comments were received from many members of the health care industry. Responses to the most significant comments are described below.

1. *Opposition to the Direct Apportionment of Malpractice Costs.*
All comments received were against the proposal and recommended that we withdraw it entirely. The main argument against the proposal was that the incurrence of malpractice costs bears no relationship to the financial class of the patient. Therefore, all patients should share equally in malpractice insurance costs or losses because these costs are incurred primarily for the benefit of the total overall patient population and for the protection of facility assets. Other arguments stressed that charges to private patients and third-party payors would necessarily increase in order to recover costs normally reimbursed by Medicare, and that additional costs for recordkeeping would be incurred.

We are aware that insurance companies generally do not determine insurance rates for malpractice insurance based upon the financial status of the patients. However, information about malpractice loss experience by type of patient (i.e., Medicare) is

readily available. Moreover, this regulation is not based on a relationship between malpractice losses and the financial status of patients. As explained above, it is grounded on a direct calculation of the costs incurred in furnishing health care to Medicare beneficiaries.

We are also aware that charges to private patients and third-party payors may increase and that additional costs for recordkeeping may be incurred; we believe that this amendment is necessary in order to prevent the program from paying a disproportionate amount of substantial malpractice costs.

2. *Direct Assignment of Overhead Costs.* We received comments urging that overhead costs other than malpractice costs also be directly apportioned. We believe that the current cost finding and apportionment procedure is generally an equitable method of allocating other overhead costs. However, because malpractice costs are so significant and the disproportionate allocation of malpractice costs to Medicare is so great, we believe a unique exception is warranted to deal with these costs.

3. *Cash Flow.* We received comments concerning the possibility of the apportionment ratio adversely affecting provider cash flow. If a provider pays a large dollar amount of Medicare malpractice claims in the current year and has little or no prior Medicare malpractice claim experience for the preceding 4-year period, the apportionment ratio of Medicare malpractice claim loss experience to total malpractice claim loss experience for the current period necessarily becomes smaller due to the averaging of the malpractice loss experience ratios for the entire 5-year period. Over the succeeding 5-year period, reimbursement would eventually reflect Medicare's malpractice claim experience. However, for the current year, the apportionment ratio (5-year average) would apportion to Medicare an amount less than what would have been apportioned had the current year's ratio for malpractice claim loss experience been used, thereby lowering Medicare reimbursement. Providers, therefore, would have to use their own funds until such time as Medicare reimbursement "catches up."

We wish to study this issue further, especially when circumstances are reversed and Medicare payment is greater than it might otherwise be, due to a particularly large malpractice claim in a given year. One possible solution could be a modification to 42 CFR section 405.454(h). Accelerated payments to providers, to provide relief to providers whose cash flow is adversely affected by the apportionment ratio. If so, a proposed change to this regulation section would be published in the Federal Register for comment.

4. *Claims Management.* We also received comments stating that this regulation would provide an incentive for providers to settle Medicare malpractice

claims without providing the same degree of claims management as for non-Medicare malpractice claims of similar nature. We do not believe that providers would actually settle Medicare malpractice claims in such a manner. Furthermore, we do not believe that others involved in such matters, such as legal firms, insurance companies, and insurers would allow these practices. However, we will watch this carefully and take action if necessary.

EFFECTIVE DATE: This amendment to the Medicare reimbursement regulations is effective for cost reporting periods beginning on or after July 1, 1979. Instructions will be provided through fiscal intermediaries for the treatment of malpractice costs for these periods and cost reporting forms will be supplied before filing.

42 CFR Part 405 is amended as follows:

1. Section 405.452 is amended by revising paragraph (b)(1) to read as follows:

§ 405.452 Determination of cost of services to beneficiaries.

\* \* \* \* \*

(b) *Principle for cost reporting periods starting after December 31, 1971.* Total allowable costs of a provider shall be apportioned between program beneficiaries and other patients so that the share borne by the program is based upon actual services received by program beneficiaries. For cost reporting periods starting after December 31, 1971, the methods of apportionment are defined as follows:

(1) *Departmental Method.* (i) Except as provided in paragraph (b)(1)(ii) of this section with respect to the direct apportionment of malpractice costs, the ratio of beneficiary charges to total patient charges for the services of each ancillary department is applied to the cost of the department to this is added the cost of routine services for program beneficiaries, determined on the basis of a separate average cost per diem for general routine patient care areas, taking into account, to the extent pertinent, an inpatient routine nursing salary cost differential (see § 405.430 for definition and application of this differential), and in hospitals, a separate average cost per diem for each intensive care unit, coronary care unit, and other special care inpatient hospital units.

(ii) *Exception:* For cost reporting periods beginning on or after July 1, 1979, costs of malpractice insurance premiums and self-insurance fund contributions must be separately accumulated and directly apportioned to Medicare. The apportionment must be based on the dollar ratio of the provider's Medicare paid malpractice losses to its total paid malpractice losses for the current cost reporting period and the preceding 4-year period. If a provider has no malpractice loss experience for the 5-year period, the costs of malpractice insurance premiums or self-insurance fund contributions must be apportioned to Medicare based on the national ratio of malpractice awards paid to Medicare beneficiaries to malpractice awards paid to all patients. The Health Care Financing Administration will calculate this ratio periodically based on the most recent departmental closed claim study.

If a provider pays allowable uninsured malpractice losses incurred by Medicare beneficiaries, either through allowable deductible or coinsurance provisions, or as a result of an award in excess of reasonable coverage limits, or as a governmental provider, such losses and related direct costs must be directly assigned to Medicare for reimbursement.

(Sections 1102, 1814(b), 1861(v)(1) of the Social Security Act (42 U.S.C. 1302, 1395f(b), 1395x(v), 1395hh).)

(Catalog of Federal Domestic Assistance Program No. 13,773, Medicare—Hospital Insurance No. 13,774, Medicare—Supplementary Medical Insurance.)

Dated: May 23, 1979.

Leonard D. Schaeffer,

*Administrator, Health Care Financing Administration.*

Approved: May 24, 1978.

Joseph A. Califano, Jr.,

*Secretary.*

[FR Dec. 79–10613 Filed 5–31–78, 8:45 am]

BILLING CODE 4110–35–46