777 F.2d 1028
 11 Soc.Sec.Rep.Ser. 291, Medicare&Medicaid Gu 35,051
MERCY HOSPITAL OF LAREDO, et al., Plaintiffs-Appellants,
v.
Margaret M. HECKLER, In Her Official Capacity as Secretary
of Health & Human Services, Defendant-Appellee.
 No. 84-2382.
 United States Court of Appeals,
Fifth Circuit.
 Dec. 6, 1985.
 
 Wood, Lucksinger & Epstein, Dennis M. Barry, Washington, D.C., for plaintiffs-appellants.
 Daniel K. Hedges, U.S. Atty., Linda M. Cipriani, C.J. (Neil) Calnan, James R. Gough, Asst. U.S. Attys., Houston, Tex., Kermit Fonteno, Dallas, Tex., for Margaret Heckler.
 Appeal from the United States District Court for the Southern District of Texas.
 Before RANDALL, JOHNSON, and GARWOOD, Circuit Judges.
 GARWOOD, Circuit Judge:
 
 
 1
 Appellants, Medicare provider hospitals, brought this suit challenging the disallowance by the Secretary of Health and Human Services of their claims for reimbursement of certain claimed costs of contract physical therapy services. The district court denied relief. It determined that the derivation and the application of cost guidelines by the Secretary was neither arbitrary, capricious or an abuse of discretion, nor in excess of her statutory authority to establish and implement a Medicare cost reimbursement program; that the guidelines as applied did not create an impermissible classification by distinguishing between physical therapy contractors and in-hospital physical therapy departments; and that appellants had generally failed to utilize the available administrative exceptions process. Because appellants have failed to exhaust their administrative remedies, we affirm the denial of relief.
 
 Facts and Proceedings Below
 
 2
 Appellants are twenty-four[1] Medicare provider hospitals ("Hospitals," "Providers" or "appellants") located in southern and south central states, including six in Texas. They are predominantly small hospitals, typically having 50-99 beds, located in small towns with populations of less than 15,000. Only three are larger than 150 beds; only one is located in an urban area (Austin, Texas). Six are located in what the Bureau of Labor Statistics ("BLS") denominates Standard Metropolitan Statistical Areas ("SMSA's"), but five of these operate in nonurban environments.
 
 
 3
 The appellant Hospitals contracted with Physical Therapy Associates ("PTA") for the provision of physical therapy services in lieu of maintaining their own departments.[2]
 
 
 4
 The Hospitals filed Medicare reimbursement cost reports with their respective Medicare fiscal intermediaries[3] for calendar year 1976. The relevant intermediaries determined that each Hospital's claimed contract physical therapy costs exceeded the guideline amounts established by the Medicare Bureau (see note 3, supra ) and disallowed the excess costs. The Hospitals joined in a group appeal to the Provider Reimbursement Review Board ("PRRB") respecting these disallowances. See 45 C.F.R. Sec. 405.1837; see also 42 U.S.C. Sec. 1395oo (b).
 
 
 5
 On February 29, 1979, following a hearing and creation of a substantial record, the PRRB reversed in part the intermediaries' disallowances. It upheld the disallowances as to those appellants operating within an SMSA, but found that the guidelines (which had been based upon data from SMSA's) were inapplicable to the nineteen rural Hospitals.
 
 
 6
 On April 27, 1979, the Administrator of the Health Care Financing Administration (the "Administrator"), as the delegate of the Secretary of the (then) Department of Health, Education and Welfare (now the Department of Health and Human Services), reviewed the PRRB decision on his own motion. See 42 U.S.C. Sec. 1395oo (f)(1); 42 C.F.R. Sec. 405.1875. He reversed the PRRB insofar as it held the guidelines to be inapplicable to the non-SMSA Hospitals; he affirmed its implicit decision that the cost guidelines were applicable to Hospitals operating within SMSA's. This in effect upheld the various intermediaries' decisions. The Administrator's decision constituted a final agency action. 42 U.S.C. Sec. 1395oo (f)(1); 42 C.F.R. Sec. 405.1877.
 
 
 7
 In May 1979, the Hospitals filed this suit in the United States District Court for the Southern District of Texas, seeking review of the Administrator's decision. See 42 U.S.C. Sec. 1395ooo (f)(1). The Federation of American Hospitals and the American Physical Therapy Association ("APTA") filed amicus curiae briefs in support of the Hospitals' position. Cross-motions for summary judgment were filed, and were argued during March 1982. On April 30, 1984, the district court granted summary judgment in favor of the appellee, the Secretary of Health and Human Services. The district court determined that the Administrator's decision should be upheld because it was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." See Administrative Procedure Act ("APA"), Sec. 706(2), 5 U.S.C. Sec. 706(2). The court determined that the Secretary's rules and regulations, and her guidelines, were reasonably related to the purposes of the enabling statute, and that there was substantial evidence to support her decision to disallow the disputed costs by application of the guidelines. The court noted specifically that most (all but three) of the appellant Hospitals had failed to utilize the administrative exception process available to them to seek reimbursements not limited by the guideline amounts. See 42 C.F.R. Sec. 405.432(f). The court determined also that the Hospitals' equal protection claim--essentially that the cost limitations standards applied to them differed from those applied to provider hospitals with in-hospital physical therapy departments--was without merit.
 
 Standard of Review
 
 8
 The scope of judicial review of an agency decision or of the validity of its regulations or rules is circumscribed. 42 U.S.C. Sec. 1395oo (f); 5 U.S.C. Sec. 706(2); see also DeSoto General Hospital v. Heckler, 766 F.2d 182, 185 (5th Cir.1985); City of Austin, Texas, Brackenridge Hospital v. Heckler, 753 F.2d 1307, 1313-14 (5th Cir.1985); Home Health Services v. Schweiker, 683 F.2d 353, 356-57 (11th Cir.1982). It is especially so in matters of the Secretary's implementation of the Social Security Act, as to which "Congress conferred on the Secretary exceptionally broad authority to prescribe standards for applying certain sections of the Act." Schweiker v. Gray Panthers, 453 U.S. 34, 101 S.Ct. 2633, 2640, 69 L.Ed.2d 460 (1981). As was true in Gray Panthers, the enabling statutory sections implicated here contain express delegation of highly discretionary legislative authority to the Secretary. Compare 42 U.S.C. Secs. 1395x(v)(1)(A), 1395x(v)(5)(A) with 42 U.S.C. Sec. 1396a(a)(17)(B) (at issue in Gray Panthers, see 101 S.Ct. at 2640).
 
 
 9
 The initial inquiry is whether the agency has acted in a way that has exceeded its statutory authority or which is in conflict with the purposes of the statute. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 823-24, 28 L.Ed.2d 136 (1971); cf. Mourning v. Family Publications Service, Inc., 411 U.S. 356, 93 S.Ct. 1652, 1660-61, 36 L.Ed.2d 318 (1973). If not, a court must determine whether the regulation or rule is "arbitrary, capricious, an abuse of discretion." Overton Park, 91 S.Ct. at 823; see 5 U.S.C. Sec. 706(2). This review is necessarily a narrow one. We must uphold the agency decision or rule if it bears a rational relationship to the statutory purposes and if there is substantial evidence in the record to support it. Mourning, 93 S.Ct. at 1661; Overton Park, 91 S.Ct. at 823; Brackenridge Hospital, 753 F.2d at 1313; Home Health Services, 683 F.2d at 356; cf. Consolo v. Federal Maritime Commission, 383 U.S. 607, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966). This requires not a preponderance of the evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Home Health Services, 683 F.2d at 356; see also Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); School Board of Broward County v. HEW, 525 F.2d 900 (5th Cir.1976). We may not substitute our judgment for that of the agency. Baltimore Gas & Electric Co. v. Natural Resources Defense Council, 462 U.S. 87, 103 S.Ct. 2246, 2252, 76 L.Ed.2d 437 (1983); Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, 435 U.S. 519, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978); Overton Park, 91 S.Ct. at 824. In reaching our decision, we must consider the "record as a whole." Universal Camera, 71 S.Ct. at 461; Brackenridge Hospital, 753 F.2d at 1313. The appropriate inquiry is "whether the regulation comports with the statute ... [and] falls within the boundaries of the grant of power in the enabling act." Brackenridge Hospital, 753 F.2d at 1314.
 
 
 10
 Even greater deference is appropriate when the question concerns the agency's interpretation of its own "legislative" regulations. Gray Panthers, 101 S.Ct. at 2640. Unless that interpretation is clearly erroneous, we must give it considerable weight. Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980); Batterton v. Francis, 432 U.S. 416, 97 S.Ct. 2399, 2405 n. 9, 53 L.Ed.2d 448 (1977); Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); cf. Brackenridge Hospital, 753 F.2d at 1313-14. Agency determinations are presumptively valid, Mississippi Hospital Ass'n, Inc. v. Heckler, 701 F.2d 511, 516 (5th Cir.1983); cf. Alabama Nursing Home Ass'n v. Harris, 617 F.2d 388, 393 (5th Cir.1980), and appellants consequently bear a heavy burden of proof to rebut this presumption and to establish that a rule or regulation is void for being arbitrary, capricious, or an abuse of discretion. Mississippi Hospital Ass'n, 701 F.2d at 516; Johnson's Professional Nursing Home v. Weinberger, 490 F.2d 841, 844 (5th Cir.1974). Only if we are left with the firm conviction that the agency has acted arbitrarily and capriciously, or that the regulation, rule or decision is not rationally related to the statute or the evidence, and that a clear error of judgment has been committed, see Overton Park, 91 S.Ct. at 824, may we find it void on these grounds.
 
 
 11
 To be sure, certain minimal procedural requirements are placed upon the agency in the promulgation of its substantive rules and regulations. In particular, APA section 553, 5 U.S.C. Sec. 553, requires "notice and comment" rulemaking procedures to be followed whenever rules which affect the rights and obligations of those being regulated are created. Chrysler Corp. v. Brown, 441 U.S. 281, 99 S.Ct. 1705, 1717, 60 L.Ed.2d 208 (1979); cf. Batterton v. Francis, 97 S.Ct. at 2405 n. 9; 5 U.S.C. Secs. 553(a), 706(2). Failure to follow these minimal procedural requirements may justify a determination that the rule or regulation is void. 5 U.S.C. Sec. 706(2).
 
 The Exhaustion Requirement
 
 12
 Appellants stage what amounts to a broad frontal assault upon the administrative "reasonable cost" guidelines established by the Secretary and utilized by the intermediaries in administering the Medicare cost reimbursement scheme. Their ultimate complaint is that the guideline reimbursable costs were fixed at too low a level, particularly for rural hospitals. They urge that the data on which the guideline figures were based was generally inadequate, related to urban rather than rural experience and was not timely adjusted for inflation. Complaint is also made that the guideline percentages for fringe benefit and expense factors and supervision allowances were too low, largely as the result of the employment of inadequate or unrealistic assumptions in arriving at the percentage figures.
 
 
 13
 All the appellant Hospitals in this case have chosen to predicate their appeal on the proposition that these guidelines were administered as absolute, rigidly fixed substantive limitations upon reimbursable costs for contract physical therapy services, and that, because the guidelines were so conceptually flawed and were derived from such inappropriate and inaccurate data, they were, as substantive regulations of the agency, arbitrary, capricious and an abuse of the Secretary's discretion, and were in contravention of the statute's purposes and express instructions. On this basis, they urge this Court to overturn the guidelines entirely. Consequently, although we find that the posture of this case does not compel that we determine whether the guidelines themselves were arbitrarily and capriciously derived, we must examine the reimbursement scheme to determine whether the Hospitals need not have first attempted to obtain administrative relief from the application of the guidelines to their cost claims.[4]
 
 
 14
 In a leading case concerning the doctrine of exhaustion of administrative remedies, the Supreme Court said:
 
 
 15
 "[T]he long settled rule of judicial administration [is] that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 58 S.Ct. 459, 463, 82 L.Ed. 636 (1938).
 
 
 16
 The Court articulated policy reasons for the doctrine of requiring exhaustion of federal administrative proceedings before being allowed to seek relief in the federal courts in McKart v. United States, 395 U.S. 185, 89 S.Ct. 1657, 1662-63, 23 L.Ed.2d 194 (1969). These include:
 
 
 17
 "(1) to avoid premature interruption of the administrative process; (2) to let the agency develop the necessary factual background upon which decisions should be based; (3) to permit the agency to exercise its discretion or apply its expertise; (4) to improve the efficiency of the administrative process; (5) to conserve scarce judicial resources, since the complaining party may be successful in vindicating rights in the administrative process and the courts may never have to intervene; (6) to give the agency a chance to discover and correct its own errors; and (7) to avoid the possibility that 'frequent and deliberate flouting of administrative processes could weaken the effectiveness of an agency by encouraging people to ignore its procedures.' " Patsy v. Florida International University, 634 F.2d 900, 903 (5th Cir.1981) (summarizing McKart discussion), rev'd on other grounds and remanded sub nom. Patsy v. Board of Regents of State of Florida, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982).
 
 
 18
 Exceptions to the requirement that administrative remedies must first be exhausted before seeking redress in the courts may be appropriate in several circumstances. The traditional exceptions are,
 
 
 19
 "[F ]irst, ... when the prescribed administrative remedy is plainly inadequate because either no remedy is available, the available remedy will not give relief commensurate with the claim, or the remedy would be so unreasonably delayed as to create a serious risk of irreparable injury. [Citations omitted.]
 
 
 20
 "Second, when the claimant seeks to have a legislative act declared unconstitutional and administrative action will leave standing the constitutional question....
 
 
 21
 "Third, ... when the question of the adequacy of the administrative remedy is for all practical purposes coextensive with the merits of the plaintiff's claim, such as when, for example, the plaintiff contends that the administrative system itself is unlawful or unconstitutional in form or application. [Citations omitted.]
 
 
 22
 "Fourth, ... if it would be futile to comply with the administrative procedures because it is clear that the claim will be rejected." [Citations omitted.] Patsy v. Florida International University, 634 F.2d at 903-04.
 
 
 23
 Determining under which circumstances to apply the doctrine is, as we previously noted in Patsy, "far from an exact science." Id. at 904. As the Supreme Court noted in McKart, "application of the doctrine ... requires an understanding of its purposes and of the particular administrative scheme involved." 89 S.Ct. at 1662. We must therefore consider this question in terms of the composition and purposes of the Medicare reimbursement administrative scheme.
 
 The Medicare Reimbursement Scheme
 Organization
 
 24
 Title XVIII of the Social Security Act of 1965 establishes the federally funded health care insurance program colloquially known as "Medicare." 42 U.S.C. Sec. 1395 et seq. Part A of that legislation provides for "basic protection against the cost of hospital, [and] related post-hospital ... care" for eligible aged and disabled persons. 42 U.S.C. Sec. 1395c.
 
 
 25
 A Medicare provider is reimbursed on the basis of its actual costs of services rendered,[5] limited to "reasonable costs", see 42 U.S.C. Sec. 1395x(v)(1), unless customary charges are less, in which case reimbursement is made on a customary charge basis. 42 C.F.R. Sec. 405.401(a). Interim monthly payments are made by the intermediary to the provider, subject to an out-of-period accounting by the intermediary. See 42 C.F.R. Sec. 405.405; see also 42 U.S.C. Secs. 1395f(b), 1395g(a). If the provider is dissatisfied with any reimbursement disallowances determined by the intermediary, it may appeal to the PRRB by timely application. 42 U.S.C. Sec. 1395oo (a)(3). Where common questions of fact or interpretation of law or the regulations are involved, a group administrative appeal may be permitted. 42 U.S.C. Sec. 1395oo (b). This case involves such an appeal. The Secretary may review any PRRB decision on her own motion within sixty days. 42 U.S.C. Sec. 1395oo (f)(1). A provider may obtain judicial review of any final decision of the PRRB, or of any subsequent decision by the Secretary, by a civil action timely commenced. Id. Review is controlled by the applicable provisions of the APA. See 5 U.S.C. chapter 7.
 
 
 26
 "Reasonable Cost" Limitations
 
 
 27
 The statute provides that reimbursements to providers are to be based on the Secretary's determination of a reasonable cost for recognized services, and provides expressly for substantial discretion in the Secretary's choice of methodology in deriving reasonable cost controls. There is an implicit caveat that the controls be accurate within some reasonable bounds, so that a provider is reimbursed for its actual, reasonable and necessary expenses in delivering covered services and so that the private sector does not in effect subsidize the Medicare program.[6] 42 U.S.C. Sec. 1395x(v)(1); see also 42 C.F.R. Sec. 405.402(a).
 
 
 28
 The Congress, perceiving a need to halt Medicare reimbursement abuses, was especially concerned that contract physical therapy services were not being delivered efficiently. See H.R.Rep. No. 92-231, 92d Cong., 2d Sess. (1972), reprinted in 1972 U.S.Code Cong. & Ad.News 4989, 5096 (report of House Ways & Means Committee) (hereinafter "House Report" or "H.R.Rep."); see also S.Rep. No. 92-1230, 92d Cong., 2d Sess., 52, 250 (1972) (report of Senate Finance Committee) (hereinafter "Senate Report" or "S.Rep."). Congress thus included 42 U.S.C. Sec. 1395x(v)(5)(A), see Pub.L. No. 92-603, Sec. 251(c) (1972):
 
 
 29
 "Where physical therapy services ... are furnished under an arrangement with a provider of services ... the amount included in any payment to such provider ... under this subchapter as the reasonable cost of such services (as furnished under such arrangements) shall not exceed an amount equal to the salary which would reasonably have been paid for such services (together with any additional costs that would have been incurred by the provider ...) to the person performing them if they had been performed in an employment relationship with such provider ... (rather than under such arrangement) plus the cost of such other expenses (including a reasonable allowance for traveltime and other reasonable types of expense related to any differences and acceptable methods of organization for the provision of such therapy) incurred by such person, as the Secretary may in regulations determine to be appropriate."
 
 
 30
 Thus, in addition to her general "reasonable cost" authority under section 1395x(v)(1), the Secretary has also been given express authority to make such regulatory provision "as the Secretary may ... determine to be appropriate" for containing costs of contract physical therapy services at "reasonable" levels.[7]
 
 Reasonable Cost Guidelines
 
 31
 The Medicare Bureau consulted informally with various industry representatives in early 1973. A draft of proposed regulations and standards to be applied was distributed in May 1973 for use in "prior consultation" with the affected industry and professionals.[8] In August 1973, the Bureau had face-to-face meetings with the APTA to discuss their written comments. (The principal item of discussion was apparently the question of whether to base physical therapy cost limitations upon measured units of service or units of time.) Notice of a rulemaking was published in the Federal Register on May 28, 1974, and more comments were solicited. Final publication of the regulations, and of an accompanying first schedule of cost guidelines promulgated thereunder, was on February 7, 1975.
 
 
 32
 The initially proposed cost guidelines were derived from 1972 BLS surveys of prevailing salaries for salaried physical therapists in established hospital therapy departments for hospitals in nineteen SMSA's. The guideline amounts were based on the Bureau's determination of seventy-fifth percentile salaries from such data. See 42 C.F.R. Sec. 405.432(b)(1); Manual Sec. 1402.1. The Bureau constructed regional areas to which individual SMSA results (or, where multiple SMSA's fell into a given region, their average) were applied.[9] The guidelines were updated to July 1974 by use of the Consumer Price Index ("CPI"). Following administrative review, approval and subsequent publication, these guidelines were first effective for the period April 1975 through the end of March 1976; they were updated for the next annual period by another application of the CPI.
 
 
 33
 BLS data was also utilized to determine appropriate percentage-of-salary values for fringe benefits, including paid vacation, sick leave, insurance and the like. See 42 C.F.R. Sec. 405.432(b)(2); Manual Sec. 1402.2. The Bureau based its percentage-of-salary figure for reimbursable expenses upon an ad hoc estimate of a single outside therapist's costs for rent, part-time secretarial service, utilities and other incidental expenses of running an off-site office. See id. The two figures were totaled and rounded to a fifty-percent-of-salary allowance rate. The "adjusted hourly salary equivalent amount" is then the sum of the prevailing (seventy-fifth percentile) salary and the fringe benefits and expenses rate. 42 C.F.R. Sec. 405.432(b)(3); Manual Sec. 1402.3. A travel time allowance equivalent to one-half hour per provider per day was also recognized, and a $1.50 travel expense allowance. See Manual Sec. 1402.4; cf. 42 C.F.R. Sec. 405.432(b)(4). An equipment allowance was also included for the actual costs of such equipment to the outside contractor. Manual Sec. 1412.1.
 
 
 34
 BLS data was not available for supervisory or administrative salary levels, so the Bureau proposed two methods which might be used to determine an appropriate allowance. Where data concerning such salaries in the area was available (for instance, from the intermediary) the prevailing (seventy-fifth percentile) supervisory salary could be used. Manual Sec. 1412.4; 42 C.F.R. Sec. 405.432(e)(1); cf. id. Sec. 405.432(b)(7). Where such data was unavailable, however, an alternative was recognized: the salary differential of a supervising registered nurse was used to derive an allowance of three percent of the prevailing therapist salary per therapist supervised.[10] Manual Sec. 1412.4.Administrative Exceptions
 
 
 35
 Although the statute does not expressly provide for administrative exceptions from application of the normative area cost guidelines, its legislative history indicates that an exceptions procedure was implicitly part of Congress' envisioned scheme. See H.R.Rep. at 5071. The Secretary's regulations contain such an administrative exceptions procedure. 42 C.F.R. Sec. 405.433(f) provides:
 
 
 36
 "(f) Exceptions. The following exceptions may be granted but only upon the provider's demonstration ... that the conditions indicated are present:
 
 
 37
 "....
 
 
 38
 "(2) Exception because of unique circumstances or special labor market conditions. An exception may be granted under this section by the intermediary when a provider demonstrates that the costs for therapy or other services established by the guidelines are inappropriate to a particular provider because of some unique circumstances or special labor market conditions in the area."
 
 
 39
 The Manual spells out the burden of proof placed upon the provider to obtain an exception. The provider must demonstrate that it attempted, but failed, to obtain contract therapy services at within-guideline limits, and that the prevailing salary for such services is generally higher in the relevant area than the guidelines allow. See Manual Sec. 1414.2.[11] Consistent with the interim payment scheme itself, exceptions are ordinarily to be applied for prospectively, and must be made to the intermediary. It is clear that the Manual recognizes the need for retrospective exception application and reimbursement of costs, however, under certain broad circumstances. Neither the Manual nor the regulations anywhere preclude a retrospective application for an exception. The denial of an exception by an intermediary may be appealed to the PRRB upon timely application. See 42 U.S.C. Sec. 1395oo (a)(3); 42 C.F.R. Sec. 405.1835 to-- .1841. Finally, if a provider is dissatisfied with its area guidelines, it may propose a different set provided the data base thereof is suitable. 42 C.F.R. Sec. 405.432(b)(6).[12]
 
 Failure to Utilize the Exceptions Process
 
 40
 Appellants assert that the exceptions process is insufficient to salvage what they assert is, because of overwhelming defects inherent in the guidelines, an irrational administrative scheme. The key point in this contention is the claim that the Secretary in practice has erected "insurmountable barriers" to obtaining administrative exceptions, and that the resulting unavailability of relief from the guidelines means that the intermediaries in effect apply those guidelines as substantive, absolute limitations. The alleged irrationality of the guidelines thus renders them arbitrary, capricious, and in violation of the statute. Alternatively, appellants argue that, because the guidelines were never enacted pursuant to APA Sec. 553 informal rulemaking requirements, they are void per se.
 
 
 41
 The Appropriateness of Seeking an Exception
 
 
 42
 To justify their attempt to obtain direct relief from the guidelines by appeal to the PRRB (and here), appellants advance the argument that no application for an exception is required before challenging disallowed amounts, even where such a challenge would have been obviated by receiving an exception.[13] Having failed to make a prospective application for an exception to their intermediaries (because, for example, of uncertainty about whether there might later be excessive actual costs), as is (they argue) required by the Manual, the appellants assert that they could not have obtained an exception retrospectively, and that they were therefore entitled to a direct appeal to the PRRB respecting any cost disallowances, even where these were predicated upon application of the guidelines.
 
 
 43
 This argument is not convincing. The Manual does suggest that a prospective application is ordinarily expected. This is desirable and consistent which the overall scheme which calls for prospective interim payments to providers, makes adjustments for actual reasonable costs only at the end of the fiscal year, and generally employs a guideline prospectively. Nowhere in the regulations or in the Manual is there, however, any indication that a retrospective application cannot be made. Indeed, under certain circumstances, retrospective application to the intermediary for such an exception is expressly allowed. See Manual Sec. 1414.2; cf. 42 C.F.R. Sec. 405.460(c). In particular, the Manual recognizes retrospective applications for exceptions where "the circumstances giving rise to the exception occur after [the beginning of the fiscal period]." Id. Appellants' characterization of the exceptions process as prospective only is simply wrong.
 
 
 44
 To the extent that the statute authorizes direct appeal to the PRRB of any cost disallowances or other matters not within the express purview of the administrative exceptions procedures themselves, we agree with appellants that they have a right to direct appeal of such issues to that board. See 42 U.S.C. Sec. 1395oo (d); 42 C.F.R. Sec. 435.1869. But where the regulatory scheme clearly indicates an administrative exception to be the appropriate course for relief from an application of the usual standards, we cannot but conclude that the failure to exhaust specifically available administrative remedies precludes an attack of the kind here made on the validity of the administrative scheme or its general normative standards.[14] Cf. Manual Sec. 1414.
 
 
 45
 Another reason also supports our conclusion that the relief sought by appellants should not be made available outside the context of an administrative exception. An applicant for an exception must prove facts that are materially different from those needed to establish that an intermediary has, for instance, misapplied the guidelines or other regulations in disallowing claimed reimbursable costs. An exception is justified only where the provider can establish both that the guidelines are inappropriately low with reference to his locality, and that diligent efforts to stay within guideline limits were unavailing. By contrast, an appeal to PRRB respecting disallowances does not necessarily implicate either showing. The unavoidable conclusion is that an appeal from the latter kind of intermediary decision is substantively as well as procedurally distinct from an appeal from a denial of an exception. Appellants may not circumvent the procedural or substantive requirements of the regulatory scheme by simply ignoring them.
 
 No Showing of Sham Procedure
 
 46
 By having chosen not to seek even a retrospective exception, appellants have forgone the opportunity to create a record which might justify their assertion that the exception procedure is a sham and that exceptions are unavailable in practice. Appellants offer little evidence beyond bare assertions to substantiate this claim. Chief among their assertions is that the Bureau required a showing that no provider in the area was able to obtain therapy contract services within guideline limits. But appellants predicate their assertion that this was in fact a rigorous standard applied by the Bureau upon one informal letter from a Bureau employee to an intermediary in answer to an inquiry regarding what kind of showing to demand in an exceptions procedure.[15] Neither Manual nor regulations contain such a requirement. Moreover, the letter in question went on to state: "Thus, if other providers in the area are able to obtain the services of therapists, the provider would also have to justify why its circumstances are so unique from that of other local providers." Appellants did not test their assertion by seeking an exception. Had they done so, and had the intermediary and the Secretary, despite a proper showing that an exception was deserved, nonetheless denied an exception on the basis of such a standard, appellants might then seek judicial review of that standard on its substantive merits.
 
 
 47
 Predicating their assertion that the exceptions procedure was a sham on such flimsy evidence is wholly insufficient. Appellants have failed to show on this record that an exception was unavailable to them, or that the guidelines were in practice ultimately substantively controlling absolute cost limitations. Rather, however strictly they may be applied by the intermediaries, it appears that, within the context of the administrative scheme as a whole, including the exceptions procedures, the cost guidelines are presumptive and advisory, rather than ultimate, rigid substantive limitations.[16]
 
 
 48
 Even were the appellants' characterization of the exceptions procedure found on a suitable record to be correct, we cannot say whether a closer examination of the merits of the guidelines as controlling substantive regulations would lead us to conclude that they were wholly invalid as being arbitrary, capricious, or discretion-abusing, or outside the statutory authority granted to the Secretary. Indeed in such situation, we think it more likely that, to the extent appellants' substantive criticisms might have merit, we would not go so far as to hold that the Secretary could not remedy any such defects by merely implementing--and following--a suitable exception process, consistent with the congressional intention. It is difficult to discern a case for more broadly and unnecessarily overturning the guidelines themselves.[17] For now, however, we pretermit such a determination as being unnecessary to our disposition of the legal questions actually presented by this appeal. Because the exceptions process was foregone by appellants here, and because we have determined that such an exception was the proper administrative relief to seek in the first instance, appellants have failed to exhaust their administrative remedies and have effectively precluded this Court from granting any relief at this time from the application of the cost guidelines by the Secretary.[18]
 
 Conclusion
 
 49
 The appellants failed to exhaust available administrative avenues, which might have avoided the Medicare cost reimbursement disallowances they appeal here, by failing to seek administrative exceptions to the normative cost guidelines imposed by the Secretary. They have failed to establish that such exceptions are in practice unavailable, so as to justify their direct broad scale challenge of the cost guidelines themselves.
 
 
 50
 Accordingly, the judgment of the district court is AFFIRMED.
 
 
 
 [1]
 A twenty-fifth provider hospital, Wharton County (Texas) Nightengale Hospital, an original plaintiff in the administrative group appeal, is not a party in this appeal
 
 
 [2]
 PTA is a large national contractor which furnishes physical therapy services to some 109 hospitals in twenty-two states. PTA is compensated under the terms of its contract by receiving a fixed share, usually sixty to sixty-five percent, of the contracting hospital's physical therapy gross revenue. In return, PTA furnishes all qualified personnel, equipment and other supplies, including substitute physical therapists when necessary, twenty-four hour on-call (for traction), all equipment acquisition, maintenance, calibration and related tasks, and the administration of all personnel matters, including fringe benefits, salaries, insurance and the like
 
 
 [3]
 An intermediary is a state, public or private health care agency, such as Blue Cross-Blue Shield, which administers the Medicare reimbursement scheme within a given area, under contract to the Medicare bureau (part of the Health Care Financing Administration ("HCFA"), which is part of the Social Security Administration, in turn part of the Department of Health and Human Services). See 42 U.S.C. Secs. 1395h, 1395u, 1395v; 42 C.F.R. Sec. 400.202; 42 C.F.R. part 421
 
 
 [4]
 Three of the Providers here apparently attempted to obtain administrative exceptions for the contract physical therapy costs. It is not clear from the record, however, whether such applications were filed prospectively or retrospectively, nor, indeed, which of appellants these were. In any event, the relevant intermediaries denied the exceptions requests. For whatever reasons, these three Providers determined not to appeal to the PRRB from the denial of their exceptions; the other Providers involved in this appeal never applied for any exception, either prospectively or retrospectively
 
 
 [5]
 Medicare and non-Medicare costs are apportioned from total provider costs over a fiscal period. The apportionment does not differentiate between the various kinds of services provided. See 42 C.F.R. Sec. 405.403
 
 
 [6]
 42 U.S.C. Sec. 1395x(v)(1)(A) provides:
 "The reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services.... In prescribing the regulations referred to in the preceding sentence, the Secretary shall consider, among other things, the principles generally applied by national organizations or established prepayment organizations (which have developed such principles) in computing the amount of payment, to be made by persons other than the recipients of services, to providers of services on account of services furnished to such recipients by such providers. Such regulations may provide for determination of the costs of services on a per diem, per unit, per capita, or other basis, may provide for using different methods in different circumstances, may provide for the use of estimates of costs of particular items or services, may provide for the establishment of limits on the direct or indirect overall incurred costs or incurred costs of specific items or services or groups of items or services to be recognized as reasonable based on estimates of the costs necessary in the efficient delivery of needed health services to individuals covered by the insurance programs established under this subchapter, and may provide for the use of charges or a percentage of charges where this method reasonably reflects the cost. Such regulations shall (i) take into account both direct and indirect costs of providers of services (excluding therefrom any such costs, including standby costs, which are determined in accordance with regulations to be unnecessary in the efficient delivery of services covered by the insurance programs established under this subchapter) in order that, under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established in this subchapter will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs, and (ii) provide for the making of suitable retroactive corrective adjustments where, for a provider of services for any fiscal period, the aggregate reimbursement produced by the methods of determining costs proves to be either inadequate or excessive."
 
 
 [7]
 The House Report reflects the preference that, "to the extent feasible, timely, and accurate," data from the BLS should be used, with suitable periodic updates by use of an appropriate inflationary index. See H.R.Rep. at 5072; S.Rep. at 251. The Senate indicated its wish that salary guidelines would be set at the seventy-fifth percentile of prevailing salaries in "appropriate given geographical areas" of salaried physical therapists employed in hospitals having physical therapy departments. S.Rep. at 251
 The legislative history reveals that the House Ways and Means Committee "expects that the Secretary will, in establishing the criteria for determining the reasonable costs of such [contract physical therapy] services, consult with the professions directly affected and give thorough consideration to procedures used in other public and private plans that may be local, regional, or national in scope." H.R.Rep. at 50-96; S.Rep. at 250-51.
 
 
 [8]
 This included a draft of a Provider Reimbursement Manual (the "Manual"), an interpretive document including proposed cost guidelines for various regions. Final publication of the Manual occurred in late 1975 or early 1976 (the record is not clear which), following a second proposed draft and receipt of comments
 
 
 [9]
 For instance, Houston and Dallas SMSA data was averaged and applied to the five-state area including Texas, Louisiana, Arkansas, Oklahoma and New Mexico; similarly, SMSA data from San Francisco and Los Angeles was applied to California as a whole. Despite the congressional committee wish that, where appropriate data was available, rural/urban distinctions be recognized, see, e.g., S.Rep. at 251, the guidelines as formulated and applied did not expressly take rural differences into account. The Secretary explains this as being predicated upon the lack of rural data, and upon BLS data indicating that, for occupations as a whole and, in particular, for hospital wages and salaries as a whole (i.e., not limited to professionals, or available for therapists as a subgroup), urban wages were significantly higher than rural wages in all geographical areas of the country
 
 
 [10]
 Prevailing salaries for physical therapists and registered nurses were generally comparable. BLS data for supervising nurses' salaries was used to determine that such salary was fifteen percent higher than that of a nonsupervisory nurse. On average, each supervising nurse had five subordinate registered nurses. Supervision of assistants or aides was specifically excluded from such allowance, because the BLS therapist salary data had not excluded these categories of responsibility. The Bureau recalculated the nurses' differential in 1975 and found it to be somewhat less than the fifteen-percent/five-nurse value determined in 1972, but retained the three-percent-per-supervisee value
 This method appears to be simply an alternative approach, however. Contrary to appellants' claim, the Manual suggests that this method is intended to be flexible, and only to illustrate the kind of determination by an intermediary which would be acceptable. See Manual Sec. 1412.4.
 
 
 [11]
 Manual Sec. 1414 provides:
 "Claimed Costs in Excess of Guidelines.
 "The following exceptions may be granted but only upon the provider's demonstration, based on appropriate evidence, that the conditions indicated are present:
 "1414.1 Exception Because of Binding Contract....
 "1414.2 Exception Because of Unique Circumstances or Special Labor Market Conditions.
 "An exception may be granted under this section by the intermediary when a provider demonstrates that the costs for therapy or other services established by the guidelines are inappropriate to a particular provider because of some unique circumstances or special labor market conditions in the area. Before the exception may be granted, the provider must submit appropriate evidence to its intermediary to substantiate its claim. The provider's request for an exception, together with substantiating documentation, must be submitted to the intermediary each year, prior to the onset of its cost reporting period, unless the circumstances giving rise to the exception occur after onset. If the circumstances giving rise to the exception remain unchanged from a prior cost reporting period, however, the provider need only submit evidence to establish that fact.
 "A provider may file a request for this exception after the onset of a cost reporting period, to be effective retroactively to the beginning of the cost reporting period if, after the initial guidelines for a specific service have been issued, (1) the provider did not have sufficient time to file its request for this exception, or (2) the provider had been granted a binding contract exception that had just expired....
 "Exceptions because of unique circumstances or special labor market conditions will only be granted in extraordinary circumstances. An exception is not proper, for instance, where an individual refuses to provide services at the rate prescribed so long as it is possible for the provider to secure such services from other sources. It is the duty of the provider to prove, to the satisfaction of the intermediary, that it has reasonably exhausted possible sources of this service without success. As a minimum, the provider must furnish evidence to establish that it has advertised on several occasions in a newspaper having widespread circulation in the area and that it has contacted employment agencies in the area, if available.
 "... In order to substantiate special labor market conditions, the provider must submit evidence to establish that the other providers in the area generally have to pay therapists or other health care specialists higher rates than the guidelines.... The key to an exception is not the rate requested for performing a particular type of service being evaluated, but the going rate for therapists or other health care specialists performing these services, particularly salaried individuals, who are working in the area. If other providers in the area are able to obtain these services at rates that do not exceed the guidelines, an exception would not be appropriate....
 "Therefore, evidence must be submitted regarding the provider's efforts to obtain therapy or other services, and also information ... to establish that the going rate in the area for this particular type of service is higher than the guideline limit and that such services are unavailable at the guideline amounts." (Emphasis added.)
 
 
 [12]
 This section provides:
 "Other statistically valid data [i.e., data compiled by other than the BLS] may be used to establish guidelines for a geographical area, provided that the study designs, questionnaires and instructions, as well as the resultant survey data for determining the guidelines are submitted to and approved in advance by the Health Care Financing Administration. Such data must be arrayed so as to permit the determination of the 75th percentile of the range of salaries paid to fulltime employee therapists." 42 C.F.R. Sec. 405.432(b)(6).
 
 
 [13]
 Most of appellants never sought any exceptions at all. Those three which did and were denied them never sought to appeal those denials. The Hospitals' appeal to the PRRB thus did not raise the exceptions issue at all, but sought instead to have the guidelines set aside entirely. The PRRB's finding that the guidelines were not applicable to the rural (i.e., non-SMSA) appellants had a practical effect arguably similar to the grant of an exception, but no question respecting exceptions was formally before the PRRB or, therefore, before the Secretary (actually, the Administrator) or the district court, and none is therefore presented to this Court. The record did not reveal, at least upon our inspection, which appellants had sought exceptions
 
 
 [14]
 It is not altogether clear that, under the circumstances in which the Hospitals' appeal to the PRRB arose, that board has the authority to grant such relief as it attempted, outside the context of an appeal from a denial of an administrative exception by an intermediary. The PRRB determined that the guidelines were not applicable to the rural providers, even as mere guidelines, although they apparently had been applied by the intermediaries in a manner consistent with the Secretary's rules and regulations. Despite appellants' arguments to the contrary, the regulations and the statute limit the appeal authority of the PRRB: it is bound to the relevant statutory law and to the Secretary's regulations and other substantive rules. 42 U.S.C. Sec. 1395oo (e); 42 C.F.R. Sec. 405.1867
 
 
 [15]
 Appellants point out, reasonably we think, that such a standard does not necessarily have a rational relationship to the showing which might legitimately be required, namely, that the guidelines do not accurately reflect the area's prevailing therapist salaries. Clearly, many circumstances could give rise to one isolated therapist's decision to accept a position at below prevailing salary levels and within guidelines limits. The Bureau, to be sure, admits that, during the initial phases of the scheme, it entertained the notion that this kind of a showing might be appropriate, but maintains that it has long since abandoned as unrealistic such a stringent standard
 
 
 [16]
 The possibility that the guidelines may generally be closely adhered to by the intermediaries and the Secretary, or that most applications for administrative exception may not be granted, is not necessarily inconsistent with this analysis. Appellants have not shown, and we are unwilling to assume, that properly requested exceptions are generally denied where the applicant has demonstrated that its diligent exhaustion of all reasonable means to obtain such services at costs within the prevailing area guidelines in fact met with no material success and that actually prevailing local salary (or other cost) scales in the particular area, determined according to the general definitions of allowable costs inherent in the relevant regulations, are in fact materially higher than in the SMSA's upon which the guidelines are based
 Because appellants have not shown that the guidelines were ultimately controlling substantive regulations as applied by the Bureau, we must conclude also that they are not therefore subjected to the same procedural scrutiny as is appropriate to formal, substantive regulations under the APA. Cf. 5 U.S.C. Sec. 553. There is simply no evidence in the record that compels any conclusion but that the guidelines were merely interpretive, presumptive and advisory standards, "guidelines," derived and applied in conformity with congressional expectations and instructions. See Bedford Medical Center v. Heckler, 766 F.2d 321 (7th Cir.1985) (appeal from denial of exception).
 
 
 [17]
 We note that the evidence in this record seems to indicate that the Secretary has in general made acceptably rational choices in deriving the guideline figures--even if it is arguable that she did not use the most accurate, most sophisticated, or the wisest methodology available. The fact that application of the guidelines has caused some actual costs to be disallowed is not necessarily reflective of an irrational basis, or one which is in application contrary to the statutory purpose of reimbursing actual, reasonable costs, as appellants in effect contend. In reference to the establishment of prospective reimbursement limits, the House Committee expressly indicated its expectation that such a scheme would create economic incentives for providers to keep costs under control. H.R.Rep. at 5069. The House Committee also recognized that guidelines or other regulations as might be promulgated by the Secretary would "of necessity be imprecise," and that they might be based on data "available for this purpose [that is] often ... less than perfectly reliable." H.R.Rep. at 5070
 These rationales were present also in Congress' decision to allow a prospective payments scheme. See Pub.L. No. 92-603, Sec. 222 (1972) (authorizing Secretary's study and experiment for alternative, prospective reimbursement programs); cf. 42 U.S.C. Sec. 1395ww(d). In discussing that scheme, the House Committee recognized "the risk of possible loss inherent in [such a prospective] method," H.R.Rep. at 5056, but determined that such risk would provide an incentive to the Medicare providers to "plan, innovate and generally to manage effectively in order to achieve greater financial reward for the provider as well as a lower total cost to the programs involved." Id. at 5066-67. "The theory is that once the rate is set [prospectively] a provider will institute cost saving measures which will maximize the difference between its actual costs and the higher prospective rate." Id. at 5067.
 Thus, the House Committee, while considering both a prospective payments scheme and the authorization to the Secretary to implement reasonable cost limitations to be predicated on prospective established guideline limitations (with appropriate administrative exceptions, see id. at 5071), recognized that the "presumptive basis" of such a scheme would have the result that "relatively high costs that cannot be justified by the provider as reasonable for the results obtained would not be reimbursable...." Id. at 5070 (emphasis added).
 Appellants also complain that a retrospective correction to the guidelines applied to other (subsequent) years was not made as far back as the period in question here. Appellants suggest that this was arbitrary and against statutory directions, but we note that retrospective corrections are mandated by the statute and the regulations only when the provider shows that its Medicare reimbursement for that period was insufficient in the aggregate, and not merely respecting one or several selected items. See 42 U.S.C. Sec. 1395x(v)(1)(A); cf. 42 C.F.R. Secs. 405.451(b)(1), 405.454(f)(3). Appellants have made no showing of nor, indeed, have they even alleged such an aggregate deficiency.
 It is theoretically possible, of course, that the guidelines might be so onerously arbitrary and/or inaccurate as to transform the exceptions process in essence into a mandatory procedure. In such a case, the guidelines themselves might be assailable directly, as if they were substantive regulations rather than interpretive norms. It is therefore appropriate to note that, within the context of our determination that the guidelines in the overall administrative process are ultimately presumptive and advisory, we find the guidelines to have been promulgated within the substantial discretion of the Secretary, and, given the reasons articulated by her for the various choices made and the promulgation of those guidelines, including choices of data base and data updating, various items to be included in given categories, and other methodological matters, we find that they were derived in a manner which was not irrational, arbitrary, capricious, discretion-abusing, or otherwise outside of or against the statutory directives or authority of the Secretary. We thus determine only that, given the presence of a reasonable exceptions procedure, the guidelines were rationally based and otherwise within the purview of the Secretary's authority.
 
 
 [18]
 As to the three appellants (out of the total of twenty-four) who did seek exceptions, the denial of those exceptions was not made the basis of the action in the district court and has not been raised by those appellants on appeal (see note 13, supra )
 We briefly note and reject appellants' equal protection argument based on the fact that contract therapists are subjected to cost standards not applicable to salaried hospital therapists. This differentiation, however, was plainly in accordance with the congressional intent and with Congress' expressed concern over the costs of contract therapy. Such a classification need have only a "reasonable basis" and "does not offend the Constitution simply because [it] 'is not made with mathematical nicety or because in practice it results in some inequality.' " Dandridge v. Williams, 90 S.Ct. 1153, 1161 (1970). Plainly, there is no showing here that these minimal criteria are unmet.